Opinion delivered June 2, 1886.

[No. 3961.]

## PETER MENGES v. THE STATE.

PRACTICE—EVIDENCE—PREDICATE.—It devolves upon the party proposing to use as evidence the written testimony of an absent witness, taken upon the examining trial of the accused, to first establish that the witness resided out of this State, or had removed beyond the limits of this State, or that he was dead, or that he had been prevented from attending court through the act or agency of the opposing party. Such predicate is not established by proof merely that the witness was absent from the State.

APPEAL from the District Court of Kimble. Tried below before the Hon. A. W. Moursund.

The indictment in this case charged the appellant, jointly with Tony Menges, Reinhart Menges and William Menges, with the theft of a steer, the property of Wiley Anderson, in Kimble county, Texas, on the fifteenth day of June, 1884. The appellant, being alone upon trial, was convicted, and his punishment was assessed at a term of two years in the penitentiary.

Wiley Anderson was the first witness for the State. He testified that in July, 1884, he went to the town of Junction City, in Kimble county, Texas, to search a herd of cattle there in charge of the hide and animal inspector, G. W. Hodges, for a two year old steer belonging to him, which he was informed was in the

herd.    He found the herd in charge of the said Hodges, near the residence of Mr. Schulter, and among the cattle composing the herd he found his animal, which he recognized at once by ear marks, brand, and flesh marks.    The witness's brand was WA, and his ear marks were a swallowfork in each ear and an under bit from the right ear.    The brand on the animal had been changed by branding an A below the original A, and by adding a down stroke to the last stroke of the W, and a down and up stroke to the first stroke of the W, changing the original W to WM connected.    The ear marks had not been altered.    Witness saw other "burned" cattle in the herd, but could not recollect any of the original or changed brands.    Quite a number of people from the lower country were present, examining the herd, on the Sunday when witness got his animal.    The witness had not seen his animal for eight or ten months before he found it in the said herd.    The range of the animal, when in the witness's possession, was near his place on Big Paint creek, in Kimble county, near the Edwards county line.    That animal sometimes crossed the line into Edwards county, but its usual and principal range was in Kimble county.    The steer described was raised and owned by the witness, and was taken from his possession without his knowledge or consent.    The witness did not know the defendant on trial, nor either of the other defendants, at the time of the disappearance or recovery of the animal.    All of the original brand except the A appeared to have been burned over, the lower A added, and the W changed as stated, when witness recovered the animal.    The change appeared to be about three weeks old, or perhaps a little older.

Cross-examined, the witness testified that the animal described in the indictment was a white faced, red animal, over two years old when recovered.    Its principal range was west and south west, in the direction of the Edwards county line.    Witness could not say how often he had seen the animal in Edwards county, but had much oftener seen it in Kimble county. Witness owned about one hundred head of cattle, the larger number of which ranged about his place, or within ten or fifteen miles of it.    The range of some of his cattle was as far from home as forty or fifty miles.    Cattle in Kimble county were in the habit of drifting considerably during the winter months, the "drift" generally tending south and south west towards Edwards and Kerr counties.    Witness saw the animal involved in this prosecution on his home range during the summer and fall of 1883,

but failed to find it during the winter of 1883. He could not remember when he last saw it in Edwards county. The witness first saw the defendant in jail, after he recovered the animal from the herd as detailed.

G. W. Hodges testified, for the State, that he was hide and animal inspector of Kimble county in 1884. During that year, the prosecuting witness, Wiley Anderson, claimed and recovered a steer from a herd in the possession of the witness. The original mark and brand on that animal were as described by Anderson, and the brand had been changed as described by Anderson. Anderson got that animal from the witness on or about June 25, 1884. A few days before, the witness, with a party, acting upon certain information, started in pursuit of a bunch of cattle. They struck the trail of the cattle near Beaver lake, whence it went to and up a creek, and thence over a mountain. A short distance beyond the mountain the party met Erich Cloudt and Buchanan, and divided, one party with the witness going forward over the trail, and the other party, under the sheriff, going back over the trail. At a point a day's drive beyond Beaver lake, which was a hundred miles distant from Junction City, the witness and his party found the cattle in a pen, in the possession of L. S. Wooten and Joe Cloudt, Wooten being in charge. Wooten offered to turn the cattle over to witness. The herd numbered either two hundred and thirty-six or two hundred and forty-six head, and included the Wiley Anderson steer described in the indictment. He also found one of his own animals in that herd, the brand on which had been changed. About ten days after the herd was taken by the witness, the prosecuting witness, Anderson, appeared and got his steer. Tony and Reinhart Menges were with the drove of cattle when they were taken by the witness and his party. Sheriff Gorman and James Clements arrested the defendant and William Menges, and brought them to the herd on the day after the herd was taken by the witness. The herd contained cattle belonging to other parties than witness and Wiley Anderson, including Latham, Light, James Clements, and the firm of Clements & Taylor. The brand on the Clements & Taylor animal had been recently altered. The several brands appeared to have been changed about the same time. At least one hundred and fifty brands had been changed, and the changes were all plain.

Cross-examined, the witness testified that he first saw the family of the defendant at Beaver lake, about eighteen miles

distant from the point where the herd of cattle was found. The
family were not with the cattle, nor did the witness know, of
his own knowledge, whence they came to Beaver lake. He did
not know, of his own knowledge, that they reached the lake on
the same day that he, witness, did. The pen in which the cattle
were found was in Crockett county, about sixty miles distant
from the nearest point in the Kimble county line. The burning
over of an old brand shows plainly in the deeper lines of the
brand. Witness did not see defendant and William Menges
with the cattle, nor did he see them until the day after he took
charge of the herd. Witness did not know, except by the marks
and brands, and claims of ownership, to whom the animals be-
longed that were taken from the herd by the several claimants.
The defendant and his co-defendants were in jail, and were not
present when the several animals were claimed and proved by
their owners. The majority of the cattle claimed from the herd
were claimed by people living in the lower country. In the win-
ter of 1883 many cattle on the Kimble county ranges drifted
toward the Gaudalupe and Perdinales rivers. The witness did
not know whether the animals he owned and found in the herd
drifted off in the winter of 1883 or not. He knew nothing about
the ranges of the several cattle composing the herd.

Erich Cloudt testified, for the State, that he saw some of the
Mengeses named in the indictment on Big Devil's river, in
Gillespie county, Texas, below Beaver lake, in June or July, 1884.
Tony Menges and the youngest of the others had a drove of cat-
tle at their camp. That drove contained one head of the wit-
ness's cattle, the brand on which had been changed. The range
of that animal had been near the witness's ranche in Kimble
county, about thirteen miles from Junction City. The witness
and his brother, Mr. Buchanan and old man Wooten were to-
gether when the herd of cattle were found by witness. The de-
fendant was not then with the herd. Among the cattle in that
herd, the witness identified a bull which belonged to Mr. Gardi-
ner, who lived in Menard county on the Llano river. The ani-
mal's brand had not been changed. The brand on another ani-
mal which belonged to James Clements had been partially
changed, and the animal counterbranded. The several brands
had been changed at different times. Some of the changes were
a week old, and others were three weeks old. Witness knew
nothing about Wiley Anderson's animal or its range.

James Clements testified, for the State, that he had known

William Menges for a considerable time, but saw the defendant and Tony and Reinhart Menges for the first time on the third day of July, 1884. Witness, sheriff Gorman, Mr. Hodges, Mr. Mills, Mr. Corder, Mr. Sam Taylor, Mr. Latham, and others, went together in pursuit of the herd of animals described by previous witnesses. Another party of gentlemen went in advance of the witness and his party, on the same mission. When that party was overtaken by the witness and his party, they had two men under arrest. The party divided when it struck the trail of the herd, that fragment of which witness was a member going to the Menges camp, where they found the family of one of the Mengeses. A broken down wagon was in camp, and the ground showed that cattle had been about the camp. The camp was found at a point about five miles distant from where the party divided. On the next morning the Menges family was taken to Beaver lake, where the party with the cattle was joined. Witness found three head of his cattle in that herd. The brands on those three animals had been run over and changed, but the ear marks were intact. Witness did not know where those particular animals ranged, but his ranch was on the Little James river, in Kimble county, about twenty miles distant from Junction City. Those animals were taken without the witness's consent.

Cross-examined, witness said that he knew nothing about the Wiley Anderson animal. Defendant and William Menges were at work on the broken wagon when the witness and his party reached their camp. That camp was about twenty-five miles from Beaver lake, where witness first saw the herd. J. H. Clements, one of the jurors trying this case, was the witness's brother. Defendant was under indictment for stealing witness's cattle.

Ben Corder testified, for the State, that he went to Beaver lake with the sheriff and others to look after the herd of cattle described by previous witnesses. On the trail, Erich Cloudt and others were met. Witness, Norris, Cloudt, Hodges, and others, then went to the herd, with which they found two of the Menges boys. Two of the witness's animals were found in that herd. The brands on each had been changed by burning over. Witness raised those cattle in McMullen county, brought them to his present ranch, at the mouth of Johnson creek, six or seven miles from Junction City, and turned them loose. The witness had never before seen any of the Mengeses before he recovered

his said cattle. Those animals were taken from the witness without his knowledge or consent. The herd contained at least a hundred head of cattle on which the brands had been recently changed. Two of the defendants were found with the herd, and two were found at their camp.

Cross-examined, the witness testified that the cattle were found at a point about ten miles distant from where the trail was first discovered. The pursuing party separated at the point where they found the trail, and the pen containing the cattle was reached after dark. They were found about five miles below Fort Hudson, and about eighteen miles from Beaver lake. Wooten, Buchanan, Haynes, Cloudt, and others, were with the cattle. Sam McCaleb and others were with witness. Witness did not know the Menges boys by their given names, and was unable to identify those found with the cattle by their given names. Had witness's animals started back to McMullen county, they would have gone through Edwards or Kerr counties. They were driven to Kimble county from McMullen, through Kerr county. The Menges boys with the cattle had no camping utensils with them, unless, perhaps, they had a coffee pot.

S. L. Wooten testified, for the State, that he saw the Menges boys on Devil's river. Witness went with a party to search the herd of cattle driven by the Mengeses, for stolen animals. Animals belonging to Hodges, Anderson, and Cloudt, were found in the herd, but none belonging to witness. Witness was one of the party which overtook the herd in charge of two of the Menges boys, whom they arrested. The Menges boys with the cattle had some cooking utensils with them. The two Menges boys with the cattle were asked if they owned the cattle, and when they replied that they did, they were arrested.

Cross-examined, the witness testified that the herd was overtaken about fifteen miles from Beaver lake. The animals were penned that night, when George Hodges and the parties with him arrived. Witness did not know which of the Menges boys was Peter. He knew nothing about the cattle except by their brands.

Joe Cloudt testified, for the State, that he had known two of the Menges boys for about four years. He knew them on Live Oak creek, in Gillespie county. One animal belonging to the witness's brother Erich, and one belonging to Anderson, were found in the herd of cattle found in the possession of the two Menges boys. Those two animals ranged near the Cloudt

ranche, in Kimble county, about ten miles from the county line. Witness saw Anderson's animal on the range in the winter of 1883. Witness, his brother Erich, Buchanan and Wooten, went together to look after cattle in the herd described. The trail of cattle was discovered about nine or ten o'clock, and was followed until the herd was overtaken. Defendant and William Menges, both of whom witness knew, were not with the herd. Witness first saw him at Beaver lake, after the cattle were taken in charge by the sheriff. Witness was unable to say whether the defend- ant and William Menges had any cattle in the herd or not. The herd contained animals in old man Menges's brand.

Cross-examined, the witness said that the wagon used by de- fendant and William Menges, and the family of one or the other of them, was not first seen by him at a point between the point at which the trail was discovered and the place where the herd was overtaken. Witness last saw Anderson's animal on the range in the winter of 1883. He often saw that animal on the range, and never saw it above five miles from home.

On re-direct examination, the witness was asked if he did not tell Anderson that he saw the animal in the spring of 1884. He replied that he "said he told Anderson in the spring, when he was hunting the animal, that he saw the same during the pre- vious winter." Witness saw that animal on the range in the " dead of winter,"—February, perhaps—and it may have been early in the spring of 1884. The two Menges boys with the cat- tle had meat wallets and pack horses, but witness saw no uten- sils in which bread and meat could be cooked.

Erich Cloudt, recalled for the State, testified that he remained with the crowd in charge of Tony and Reinhart Menges, and the herd, until Beaver lake was reached. Either Tony or Reinhart got some article of clothing out of the wagon, but witness did not know what it was.

The State next introduced in evidence the certificate of the county clerk of Gillespie county, Texas, setting out the various marks and brands recorded in that county in the names of the several members of the Menges family. G. W. Hodge, being recalled by the State, testified that the herd contained animals in the brand of William Menges and defendant, and in several other brands set out in the certificate. Some of them were "straight" brands—that is, brands that had not been disfig- ured.

S. L. Wooten, recalled, testified, for the State, that when the

herd was overtaken, the two Menges boys in charge were asked who owned the cattle. They replied that they and their two brothers, who were detained behind with a broken wagon, owned all save a few which belonged to one Phillips. The arrest was not made until after this statement. The talking was done by Reinhart Menges. He spoke of his brothers, but called no names, as the owners of the cattle.

District clerk A. J. Wilson testified, for the State, that two or three months ago he heard that John B. Gorman was in New Mexico. Gorman left Kimble county in October, 1884. Witness had issued process for him since then, but not recently. He did not know as a fact whether the said Gorman was in or out of Texas.

Mrs. John B. Gorman testified, for the State, that she did not know the present whereabouts of John B. Gorman. She had not received a recent letter from him. His last letter to witness was received about a month prior to this trial. It was written from a point in the United States, but not in Texas. Witness did not observe the post mark on the envelope, but knew that her husband was not in Texas. The testimony of this witness and the witness Wilson constitutes the predicate upon which Gorman's written testimony was admitted, and is the subject matter of the ruling upon which this appeal is disposed of.

Justice of the peace Bradshaw identified a certain instrument of writing as the testimony of John B. Gorman, upon the examining trial of the defendant for the theft of the Hodges animal. The same was then read in evidence by the State, over the objection of the defendant.

In substance, Gorman testified on the said examining trial that he first saw the defendant at the mouth of Dolan's creek, on Devil's river. Witness went to Beaver lake with Hodges and others. At Beaver lake witness learned that the cattle could be found at the mouth of Dolan, and with his posse he set out for that point. They found a cattle trail about five miles above the mouth of the said creek. At that point they met Erich Cloudt, Buchanan, and Norris, who told him that the Menges brothers were at the mouth of Dolan. Witness took Norris and others with him, and reached the camp of defendant and William Menges about dusk, and arrested the said William and defendant. Seven head of cattle about the camp were claimed by the parties with witness. Witness warned defendant and William against making statements, but they said they had bought and

paid for the cattle; that defendant and Reinhart were hired hands, Peter having recéntly sold his interest in the cattle. Witness did not see among the cattle any that he knew whose ·brands had been changed into Peter's brand, but he saw that brand fresh in the herd.

Cross-examined, the witness said that when he arrested the defendant, the latter was at work on a broken wagon near the mouth of Dolan creek on Devil's river. A woman and three children, claimed by defendant to be his family, were in the camp. Witness did not know where the main herd of cattle was on July 3, 1884, when he arrested the defendant, but he saw the herd at Beaver lake on the evening of July 5. Defendant claimed that he had sold the cattle in his brand to his brothers. Witness never, at any time, saw the defendant in possession of the cattle. The herd was not driven over a road, but over a trail through a rough and secluded section of country. William Menges claimed full and absolute control of the cattle, and de-fendant claimed to have nothing to do with them. The parties claimed that they were hunting water and grass for their stock. Witness knew of no better route through that country than that traveled by defendant and his co-defendants with the herd.

William McCaleb testified, for the State, that he had seen the Menges boys, but did not know them apart by their given names. The witness first saw a bunch of cattle at Beaver lake, in charge of two men, before the arrest of the Menges boys. One of the men in charge of these cattle told witness that his name was Menges, and that one of his hands had gone to Del Rio for sup-plies. Two or three days later, witness again saw the herd at Beaver lake, then in charge of three men. A wagon, a woman, and some children were then in the camp. Among the cattle in the herd the witness recognized one animal belonging to James Clements, and one belonging to Erich Cloudt. The brands on each of those animals had been recently changed.

Cross-examined, witness said that he did not know the parties with the herd when he first saw it, and knew that one of them was named Menges only by his saying so. Witness did not know Peter Menges, and could not say that he was or was not one of the men he saw with the herd. It was two or three weeks before the arrest of the Mengeses that witness first saw the herd at Beaver lake. He did not know how long the herd had been there, but, judging from appearances, he thought ten days would cover the time. Witness could not swear that he

saw more than one of the Menges boys with the herd, and he knew him to be a Menges only because he claimed that name.

On re-direct examination, the witness testified that the woman and children were not with the cattle when he first saw them. Witness traveled a short distance with the wagon en route to the cattle. The parties in the wagon said that they had been to Del Rio for supplies and were going to a cattle camp. Witness did not know who the man with the wagon was. He did not know Peter Menges.

No evidence was introduced by the defense upon the trial of the main case. One of the grounds assigned in the motion for new trial was that one of the jurors was too drunk to hear and determine the evidence, and in support of that ground the defendant introduced several witnesses who testified that when the juror was first impaneled he appeared to be sober. The panel was completed just before adjournment for dinner, and the jurors were dismissed for dinner, without having been sworn, and were permitted to separate and go where they pleased, unattended by an officer, during adjournment. When, after dinner, the jury were placed in the box and sworn, the said juror appeared to be quite drunk. He took a standing position behind the district attorney while that officer was reading the indictment, and a seat before the witness Anderson while he was testifying from a paper in his hands. None of the several witnesses could swear positively that the juror was too drunk to understand the evidence and pass upon it intelligently, though one witness, who had been drunk himself, knew that, if drunk to that degree himself, he would be unable to attend to business.

In opposition to the motion, the State filed the affidavit of the juror himself to the effect that he was not too drunk on the trial of the case to understand and consider the evidence on the trial. On the contrary, he did understand and consider it as well as he could have done under any other circumstances. This affidavit was supported by the affidavits of three other jurors to the effect that the said juror was not mentally or physically incapable of understanding and considering the evidence adduced on the trial. On the contrary, his discussion of the same, in the retirement of the jury, disclosed the fact that he fully understood and appreciated it.

*W. W. Martin* and *Sneed, Pendexter & Burleson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. Defendant's ninth bill of exceptions is well taken. A sufficient predicate for the admission of the testimony of Gorman, which testimony had been taken before an examining court, was not laid by the State. It was not shown that said Gorman resided out of this State, or had removed beyond the limits of this State, or that he was dead, or that he had been prevented from attending the court through the act or agency of the defendant, etc. (Code Crim. Proc., Arts. 772, 773, 774.) The mere absence of the witness out of the State did not render his testimony admissible. (Cooper v. The State, 7 Texas Ct. App., 194; Pinkney v. The State, 12 Texas Ct. App., 352; Evans v. The State, 12 Texas Ct. App., 370.) This testimony was material, and its admission over the objections of the defendant was error for which the conviction must be set aside.

As to other testimony admitted over defendant's objections, we perceive no error. Other questions presented in the record are not considered, because of a character not likely to occur on another trial.

Because of the error of admitting the testimony of Gorman, the judgment is reversed and the cause remanded.